IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
No. 3:25-cv-00199-JDA

| | | |
|---|---|---|
| MARION BOWMAN, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CAPITAL CASE** |
| | ) | |
| BRYAN P. STIRLING, in his official capacity | ) | **EXECUTION SCHEDULED** |
| as the Director of the South Carolina Department | ) | **JANUARY 31, 2025** |
| of Corrections, and; | ) | |
| | ) | |
| HENRY DARGAN McMASTER, in his official | ) | |
| capacity as Governor of the State of South | ) | |
| of South Carolina, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MOTION FOR INJUNCTIVE RELIEF
### *AND REQUEST FOR EXPEDITED CONSIDERATION*

Plaintiff and death-sentenced prisoner Marion Bowman is presently **scheduled for execution on January 31, 2025**. Pursuant to Fed. R. Civ. P. 65, Bowman asks the Court to enjoin his execution so he is not put to death before the constitutional claims detailed in his complaint regarding the State of South Carolina's refusal to provide reasonable information about its lethal injection procedure can be adjudicated. Without the minimal information that Plaintiff Bowman seeks, it is impossible for him to meaningfully exercise his state-conferred right to choose the method of execution he considers least inhumane.

Plaintiff Bowman asks the Court to temporarily enjoin his execution until it can determine whether to enter a preliminary injunction in order to maintain the status quo while the Court fully considers the claim raised in this suit. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999) (explaining that "a preliminary injunction preserves the

1

status quo pending a final trial on the merits, [while] a temporary restraining order is intended to preserve the status quo only until a preliminary injunction hearing can be held").[1]

Similarly, Bowman asks the Court to establish an expedited briefing and hearing schedule on this motion, in order to balance the State's interest in the timely conduct of executions with Plaintiff Bowman's weighty interest in having this meritorious constitutional issue ruled upon prior to his execution. For the reasons below, the Court should issue a preliminary injunction against Bowman's execution to allow the Court to fully consider the merits of this suit.

As shown below, South Carolina's refusal to disclose the most basic information about its lethal injection drugs—a disclosure that is not barred by any state law—amounts to one of the most secretive execution procedures in the country, even when compared to other states that have carried out executions over the past several years. A temporary restraining order and preliminary injunction should be entered to prevent Bowman's execution while the Court considers his request for basic yet critical material that has been readily provided in other active death penalty jurisdictions, and may be provided in South Carolina without running afoul of any state law protecting execution-related information.

## FACTUAL BACKGROUND

As explained more fully in the complaint, South Carolina law states that a condemned prisoner will be executed by electrocution unless they affirmatively elect one of two other methods: the firing squad and lethal injection. S.C. Code § 24-3-530. The Supreme Court of

---

[1] Whether the relief granted is a temporary restraining order or preliminary injunction, Bowman's arguments are the same because "[t]he substantive standards for granting a request for a temporary restraining order and entering a preliminary injunction are the same." *S.C. Progressive Education Fund v. Andio*, 493 F.Supp.3d 460, 465 (D.S.C. 2020).

South Carolina has held that the purpose of "the choice provisions of section § 24-3-530" is to ensure that "a condemned inmate in South Carolina will *never* be subjected to execution by a method he contends is more inhumane than another method that is available." *Owens v. Stirling*, 904 S.E.2d 580, 608 (S.C. 2024) (emphasis added).

South Carolina law also prohibits the disclosure of identifying information of "any person or entity that participates in the planning or administration of the execution of a death sentence, including any person or entity that prescribes, compounds, tests, uses, manufactures, imports, transports, distributes, supplies, prepares, or administers the drugs, medical supplies, or medical equipment utilized in the execution of a death sentence . . . . in any administrative, civil, or criminal proceeding in the courts, administrative agencies, boards, commissions, legislative bodies, or quasilegislative bodies of this State, or in any other similar body that exercises any part of the sovereignty of the State." S.C. Code § 24-3-580(A)(1), (B).

South Carolina law further states that, upon receiving a notice of execution, the director of the South Carolina Department of Corrections must "determine and certify by affidavit under penalty of perjury to the Supreme Court whether the methods [of execution] provided" by the state's capital punishment statute—electrocution, the firing squad, and lethal injection—"are available." S.C. Code § 24-3-530(B). The director must make this certification within five days of receiving an execution notice, *Owens*, 904 S.E.2d. at 604 n.23, which is eight days before the inmate is required to make his execution method election. S.C. Code § 24-3-530(A).

As to lethal injection, the state supreme court has held that the director's certification must set forth the "process that he decides is appropriate for satisfying himself that the drugs are capable of carrying out the death sentence according to law . . . in sufficient detail that a condemned inmate and his attorneys may understand whether there is a basis for challenging the

constitutionality of the impending execution." *Owens*, 904 S.E.2d. at 605. While ordering the director to comply with the secrecy statute described above, the court held that the statute and due process requires the director to disclose "some basic facts about the drug's creation, quality, and reliability" and "the drugs' potency, purity, and stability." The court noted that there is also "a Due Process Clause component to our analysis of this claim[.]" *Id.* at 604.

On January 3, 2025, the South Carolina Supreme Court issued an execution notice directing the South Carolina Department of Corrections to carry out Bowman's execution on January 31, 2025. On January 8, 2025, Corrections Director Stirling submitted a certification to that court, pursuant to S.C. Code § 24-3-530(B), stating that he had obtained pentobarbital for use in lethal injections. Defendant Stirling also stated in his certification that the pentobarbital is of sufficient potency, purity, and stability to carry out executions, claiming that the forensic laboratory of the South Carolina Law Enforcement Division (SLED) had tested and approved the pentobarbital, without providing the date of the testing. Stirling provided no information about the nature or results of those tests. Complaint Exhibit 15.

Stirling's certification for Bowman is identical to the certifications he proffered for the executions of Freddie Owens and Richard Moore, which were before this Court in *Bixby v. Stirling*, No. 3:24-cv-5072-JDA. In the *Bixby* litigation, the Court denied with prejudice all constitutional challenges to state law and claims seeking disclosure of additional information about the execution drugs, except one. The Court denied without prejudice the request by the *Bixby* plaintiffs (which included Bowman) for information that was not expressly barred from disclosure by South Carolina's secrecy law, S.C. Code § 24-3-580. *See Bixby*, No. 3:24-cv-05072-JDA (Docket Entry 31, pp. 23-25) (with respect to claims "based on Defendants' refusal to provide information regarding Owens's execution that the Shield Statute does not protect," the

Court explained that it would "be prepared to issue a prompt decision at the appropriate time should any of the Remaining Plaintiffs raise similar challenges once their claims ripen.").

As outlined in Bowman's complaint and Dr. Almgren's affidavit, *see* Complaint Exhibit 7, Bowman is not asking for information protected by the secrecy law, namely, information that would identify any person involved in the execution process. Bowman's request in this lawsuit is a highly circumscribed one that focuses solely on a narrow category of information that will simultaneously satisfy Defendants' interest in enforcing the state secrecy law and preserving their ability to conduct executions, while also satisfying Bowman's due process interest in having sufficient information to make an informed choice among the available methods of execution.

## **ARGUMENT**

A temporary restraining order and preliminary injunction is appropriate when the plaintiff establishes: (1) likelihood of success on the merits; (2) irreparable harm without the preliminary relief; (3) the balance of equities tips in the moving party's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Defense Council, Inc*., 555 U.S. 7, 20 (2008); *Centro Tepeyac v. Montgomery Cty*., 722 F.3d 184, 188 (4th Cir. 2013). Where a plaintiff makes a strong showing of irreparable harm, the need to show a likelihood of success on the merits is lessened. *Rogers v. Comprehensive Rehab. Assocs., Inc.*, 808 F. Supp. 493, 498 (D.S.C. 1992).

Plaintiff Bowman meets these criteria because of his clear right under state law to reasonable information; his tailored request for information, which is not barred from disclosure by state secrecy rules concerning executions; and because the information he seeks poses no threat to South Carolina's ability to impose death sentences.

I.     **Plaintiff Bowman is likely to succeed on the claim that South Carolina's failure to provide necessary information to choose between lethal injection, the firing squad, and electrocution violates his right to due process.**

Much like the preliminary injunction analysis itself, a claim of procedural due process involves a flexible inquiry and calls on courts to fashion remedies that balance the interest of those seeking additional procedural protections with the government's ability to implement its own interests without undue burden. *See Incumaa v. Stirling*, 791 F.3d 517, 532 (4th Cir. 2015) ("Particularly in the prison context, the requirements of due process are flexible and call for such procedural protections as the particular situation demands.") (citation and internal quotations omitted). As a general matter, "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotations and citation omitted). When determining what process is due, a court must balance: (a) the nature of the private interest that will be affected by the governmental action; (b) the risk of erroneous deprivation through the procedures used and the probable value of requiring additional procedural safeguards; and (c) the government's interest. *Id.* at 335. This balancing analysis favors disclosure of the limited information Plaintiff Bowman seeks about his execution.

A.     **Plaintiff Bowman has a state-conferred right to choose the least inhumane method of execution available.**

"The Supreme Court has long recognized that," in order to invoke procedural due process protections, there must be a "state statute, regulation, or policy [that] creates such a liberty interest . . . ." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). As this Court explained in *Bixby*, *see* Docket Entry 31, p. 30, to establish the existence of a state-created liberty interest, a prison inmate must first show that a state statute, regulation, or policy "creates an objective

expectation in the liberty interest in such a way that an inmate could reasonably expect to enforce it against prison officials." *Desper v. Clarke*, 1 F.4th 236, 247 (4th Cir. 2021) (cleaned up).

South Carolina law provides Bowman the right to make an informed choice about his method of execution. The state-created interest here has its roots in a South Carolina statute, S.C. Code § 24-3-530(A), which grants Plaintiff Bowman "the right of election" to choose between the available methods of execution. The statute underscores the importance of this right by also requiring, in subsection (E), that "[t]he Department of Corrections must provide written notice to a convicted person of his right to election under this section and the available methods." The South Carolina Supreme Court has recognized that S.C. Code. § 24-3-530(A) creates a right to choose between multiple methods of execution. In 2021, the state supreme court enjoined executions because "only a single method of execution [was] available, and due to the statutory right of inmates to elect the manner of their execution . . . ." Complaint Exhibits 1 and 2.

Then, when deciding the state constitutional challenges in 2024, the state supreme court explained why the statutory right of choice exists and the interests it is designed to protect. It clarified that a "condemned inmate may elect to have the State employ the method he and his lawyers believe will cause him the least pain," and explained that "[u]nder the choice provisions of section 24-3-530, a condemned inmate in South Carolina will never be subjected to execution by a method he contends is more inhumane than another method that is available." *Owens v. Stirling*, 904 S.E.2d 580, 608 (S.C. 2024).

The state supreme court also clarified that the corrections director is required to provide the necessary information to effectuate the statutory right to choose the least inhumane method available. With regard to lethal injection, the state court held that the corrections director has an obligation to "explain . . . the basis of his determination that the drugs are of sufficient 'potency,

purity, and stability' to carry out their intended purpose." *Id.* at 604. The court added that "[t]he text of section 24-3-530 requires" the corrections director to provide "sufficient detail" about the execution drugs such "that a condemned inmate and his attorneys may understand whether there is a basis for challenging the constitutionality of the impending execution." *Id.* at 605. Leaving no ambiguity about the nature of this state-conferred right for purposes of procedural due process, the *Owens* court made clear, "[there] is a Due Process Clause component to our analysis" of the information required for disclosure under § 24-3-530. *Id.* at 604.

This Court, in *Bixby*, recognized that South Carolina law affords Bowman a liberty interest, at least to some degree, in information about the procedures for his execution:

> The Court acknowledges that the Death Penalty Statute also
> provides the Remaining Plaintiffs with a right to have the Director
> explain the process he used to satisfy himself that the SCDC has
> drugs that are adequate to conduct an execution by lethal injection.
> *See Owens*, 904 S.E.2d at 604–05. However, as explained, the
> Remaining Plaintiffs have not alleged standing in this case to
> challenge the adequacy of any certification Stirling has already
> provided.

*Bixby*, No. 3:24-cv-05072-JDA (Docket Entry 31, p. 31 n.16.).

In light of South Carolina law conferring both a right to elect a method of execution, and also conferring a right to some quantum of information about the execution drugs—as well as this Court's apparent recognition that such a right exists under state law—Plaintiff Bowman has established a liberty interest triggering procedural due process protections.

**B.      Defendants' refusal to provide basic information about the execution drugs undermines Plaintiff Bowman's ability to make an informed choice about his method of execution.**

Prior to his execution notice being issued, Bowman asked Director Stirling to disclose the information Bowman would need to make an informed choice about whether lethal injection will be a less inhumane method of execution than other available methods. Complaint Exhibit 12. Yet

the certification Stirling provided does not include any of the information that Bowman

requested. Complaint Exhibit 13. That information is as follows:

> a. The date on which the drugs were tested.
>
> b. The Beyond Use Date, after which compounded drugs should not be used.
>
> c. If the drugs were commercially manufactured, the expiration date.
>
> d. The methods and procedures used to test the pentobarbital, including documentation of test method validation and details of quality control procedures and methodology.
>
> e. The actual results obtained from the testing.
>
> f. Where the drugs will be stored prior to their use, and how the storage conditions will be monitored, including temperature and humidity controls.

*See* Complaint Exhibit 7 (Affidavit of Dr. Almgren).

As Dr. Almgren explains, in the absence of this information, there are risks of "extensive

damage to the blood vessels and surrounding tissue," "intense pain upon injection," and

potentially "a prisoner regaining consciousness, perhaps with organ or brain damage from

oxygen deficits suffered during the attempt at execution." This information, from a highly

qualified expert, is more than enough to demonstrate that Bowman cannot meaningfully decide

which method of execution "will cause him the least pain" without knowing the risks inherent in

the specific drugs Defendants plan to use for lethal injection.

Dr. David Waisel, a practicing anesthesiologist at St. Jude Children's Research Hospital

in Memphis, Tennessee, reached similar conclusions. Complaint Exhibit 16. Upon review of

information pertaining to the execution of Richard Moore, Dr. Waisel concluded "to a

reasonable degree of medical certainty that South Carolina failed to administer five grams of

effective pentobarbital during the execution of Richard Moore" resulting in the "substantial risk

that he experienced needless and extensive suffering during his execution." *Id.* He explained that

because of the "State's inadequate transparency, there is insufficient information about the lethal injection process for anyone to assess its risks and benefits as compared to execution by firing squad or electrocution." *Id.*

Bowman also needs the information because his unusually large body size increases the risk that the standard dose of pentobarbital will fail to bring about his death in a timely and humane way. Further, because of Plaintiff Bowman's unusually large body size, he will require a different dosage than the average person to ensure the execution occurs without the problems seen in Moore's execution.[2] As Dr. Waisel explained, because Plaintiff Bowman's body composition falls into the "severely obese" category, there is an increased danger of difficult IV access that could be compounded by an "ineffective dose of pentobarbital" leading to a potentially torturous execution process. *Id*.

Moreover, the circumstances of Richard Moore's recent execution suggest that SCDC has already conducted at least one pentobarbital execution that inflicted unanticipated pain. Dr. Waisel reviewed records pertaining to Mr. Moore's execution. This review revealed numerous troubling facts and issues pertaining to Mr. Moore's execution:

> Mr. Moore's autopsy revealed he was administered "2 x 2.5 g pentobarbital [5 grams] at 18:01" and "a second round of 2 x 2.5 g [5 grams] at 18:12." He was pronounced dead 23 minutes after the administration of the initial 5 grams of pentobarbital at 18:24. Given the extraordinarily high dose of pentobarbital administered at the outset of the execution, it is concerning that two separate five-gram doses of pentobarbital were required before Richard Moore was declared dead. A properly administered dose of five grams of effective pentobarbital should eliminate all breathing within a minute or less. . . I believe to a high degree of medical certainty that it is physiologically and pharmacologically

---

[2] The Department of Corrections shows Marion Bowman's height as 6'04" and his weight as 389 lbs. (available at *Inmate Search Detail Report, Bowman, Jr., Marion*, https://public.doc.state.sc.us/scdc-public/inmateDetails.do?id=%2000006006) (last visited January 10, 2025).

impossible for Mr. Moore to remain alive for ten minutes after a dose of five grams of fully-potent pentobarbital, unless that dose was not delivered completely.

Mr. Moore's autopsy also documents that he suffered from pulmonary edema. . . pulmonary edema is when fluid from the bloodstream floods the lungs, making it more difficult to breathe, and causing sensations of shortness of breath similar to the experience of drowning. While pulmonary edema can have many causes, it is my belief with a reasonable degree of medical certainty that Mr. Moore's edema was caused by the obstruction of his upper airway from the sedation effects of pentobarbital, even as he continued breathing, which caused fluid to seep out of the blood vessels inside his lungs. Mr. Moore's autopsy report documents clinical features of this type of edema—called negative pressure pulmonary edema—in that he had pink froth in his airway. Its onset would occur almost immediately following the initial IV administration of pentobarbital, as the tissues in his upper airways collapsed and his vocal cords closed. If sensate, a person whose lungs filled with the fluid of pulmonary edema would suffer feelings of drowning and suffocation. In an execution setting where the administered pentobarbital is either not completely effective or is delivered ineffectively, the pentobarbital would affect the prisoner's airways and lead to pulmonary edema while simultaneously failing to sufficiently anesthetize the prisoner to these torturous sensations. It appears likely that during Mr. Moore's execution, he consciously experienced feelings of drowning and suffocation during the 23 minutes that it took to bring about his death.

Complaint Exhibit 16.

As both Dr. Waisel and Dr. Almgren explain, without the information outlined above, Bowman will not be in a position to decide between the methods of execution while fully informed of the risks attendant to the lethal injection option.

Finally, as noted in Bowman's complaint, most of his due process concerns would be satisfied if Defendants were directed to make the execution drugs available for testing at an independent lab that the parties agreed upon, and if Bowman were provided the full results of those tests. This alternative relief would allow Defendants to maintain confidentiality of sensitive

State documents while simultaneously permitting Bowman access to the information he needs about the pentobarbital to make an informed decision about the relative risks posed by the available methods of execution. If the Court were to order this relief, Bowman would still need Defendants to disclose information about the drug's storage conditions, particularly subsequent to the independent testing.

**C.     The refusal to provide basic information about the execution drugs does not significantly impair any state interest.**

In refusing to provide basic information about the drugs, Defendants are likely to assert two state interests: the interest in shielding identifying information about individuals and entities involved in carrying out executions, and the interest in being able to carry out Plaintiff Bowman's death sentence. Yet providing the information Bowman seeks would compromise neither interest.

As for the first interest, confidentiality, Bowman has made reasonable, limited requests for information about the execution drugs that can be addressed without violating or invalidating South Carolina's secrecy statute. The South Carolina Legislature enacted S.C. Code § 24-3-580(B) to protect the "identifying information of a person or entity that participates in the planning or administration of the execution of a death sentence . . . ." The law does so by establishing that "identifying information" must be "construed broadly" to protect numerous aspects of the identity of execution team members:

> to include any record or information that reveals a name, date of birth, social security number, personal identifying information, personal or business contact information, or professional qualifications. The term "identifying information" also includes any residential or business address; any residential, personal, or business telephone number; any residential, personal, or business facsimile number; any residential, personal, or business email address; and any residential, personal, or business social media account or username.

S.C. Code § 24-3-580(A)(2); *see also* § 24-3-580(I).

The secrecy law goes on to require that "[t]his section shall be broadly construed by the courts of this State so as to give effect to the General Assembly's intent," and specifies that intent as "the absolute confidentiality of the identifying information" of those involved with executions. S.C. Code § 24-3-580(I).

Beyond individuals' or entities' identifying information, the secrecy law addresses execution drugs by exempting their creation or dispensing for executions from licensing and regulatory requirements. S.C. Code §§ 24-3-580(D), (E), and (F). However, the secrecy law does not establish any provision governing or limiting disclosure of information about the transportation, storage, testing, or chemical composition of the drugs.

Given this statutory backdrop, Plaintiff Bowman has not asked for any information that would lead to revealing the identities of the individuals or companies involved in creating, storing, or transporting the drugs. He has not tried to find out who those people were so their specific history, skills, or qualifications can be scrutinized. Mindful of state law, Plaintiff has merely asked for information about the drugs' characteristics that are relevant to their efficacy, and about the specific testing performed and results obtained to confirm the pentobarbital will work as claimed. There is no basis in state law for Defendants to refuse disclosure of this information. Defendants can disclose the drug-related information to Bowman without violating any provision of the secrecy law.

The purpose of the secrecy statute, S.C. Code § 24-3-580, is "to ensure any identifying information of a person or entity that participates in the planning or administration of the execution of a death sentence shall be confidential" and is not limited to information pertaining to lethal injection. The Defendants provided, in each affidavit, the dates on which the electric

chair and systems were tested. Complaints Exhibits 4, 9 and 15. Inexplicably, the Defendants failed to provide similar information regarding the dates on which the lethal injection drugs were tested even though the South Carolina Supreme Court instructed the Defendants that testing should be "recently performed." Complaint Exhibits 4, 6, 9, 15, 12 and 13; *Owens v. Stirling*, 443 S.C. 246, 293, 904 S.E.2d 580, 605 (2024), *reh'g denied* (Aug. 16, 2024).

Turning to the next State interest that Defendants are likely to advance, Defendants will undoubtedly protest that their chosen interpretation of the secrecy statute, and refusal to provide the requested information, is necessary to protect the State's ability to obtain the drugs and equipment needed to carry out lethal injections. Yet any such claim is undermined by the fact that other states have conducted executions while also permitting access to the same or similar information that Plaintiffs seek.

Since 2020, the Texas Attorney General has issued a series of public record request rulings requiring disclosure of information including execution-drug storage inventory logs, expiration dates, DEA forms, lab reports, and receipts, subject to redaction of identifying information of entities and persons involved in the execution process.[3] Yet in the same time period, since 2020, Texas has executed 24 prisoners, all with lethal injection.

In 2021, a Georgia federal district court ordered extensive disclosure of documents about lethal injection drugs, subject to limited redactions to protect the identity of those involved:

> Documents concerning the compounding or mixing of
> pharmaceutical ingredients for use in Georgia's Protocol, including
> documents showing chemical properties and the process by which
> the compound is manufactured and the length of that process

---

[3] Tex. Atty. Gen. Op. OR2022-10880, 2022 WL 1232223 (Apr. 13, 2022); Tex. Atty. Gen. Op. OR2021-25974, 2021 WL 4465070 (Sept. 21, 2021); Tex. Atty. Gen. Op. OR2021-11962, 2021 WL 2801824 (May 7, 2021); Tex. Atty. Gen. Op. OR2021-05915, 2021 WL 1411021 (Mar. 10, 2021); Tex. Atty. Gen. Op. OR2020-29881, 2020 WL 7629911 (Dec. 2, 2020); Tex. Atty. Gen. Op. OR2020-20270, 2020 WL 4890668 (Aug. 13, 2020).

> (Request No. 15), can be redacted to provide that relevant
> information without disclosing pharmacies and pharmacist and
> thus threatening Georgia's ability to enforce its laws. This will
> allow Plaintiff the information he needs to assess the efficacy of
> the lethal injection drug without jeopardizing the disclosure of
> critical information. So too, documents showing the inspection,
> supervision, oversight, and quality of any facility producing the
> lethal injection drug (Request No. 13) and documents related to the
> transportation and storage of pharmaceutical ingredients used in
> the Protocol (Request No. 14) can be redacted and produced so that
> Plaintiff obtains the information he seeks without jeopardizing
> Georgia's interests.

*Martin v. Ward*, No. 1:18-CV-4617-MLB, 2021 WL 1186749, at \*9 (N.D. Ga. Mar. 30, 2021).

Even with this disclosure, Georgia was still able to carry out a lethal injection execution in

March 2024.

Utah has a regulation, Utah Admin. Code R251-107-7, that permits "press access to the

execution and information concerning the execution," and "recognize[s] the need for the public

to be informed concerning executions" and for the corrections department to "cooperate with the

news media to inform the public concerning the execution in timely manner." Even with this

general policy favoring transparency, Utah conducted a lethal injection execution in 2024.

In a South Dakota district court decision—*Moeller v. Weber*, No. CIV 04-4200, 2013 WL

5442392 (D.S.D. Sept. 30, 2013)—the court unsealed method of execution documents, subject to

redactions, because it was "a continuing matter of public interest and concern both in South

Dakota and elsewhere . . . ." The district court rejected the defendants' theory that documents

with identification redacted must remain sealed to prevent plaintiffs or the public from piecing

together the identity of those involved:

> The Defendants have urged a mosaic theory with the idea being
> that by taking different pieces of unsealed information the identity
> of executioners, compounding pharmacist, and manufacturer could
> be deduced. The Court does not agree with that argument except to
> the extent that the qualifications of persons need not be so specific

> that they could result in identification of execution team members
> or the compounding pharmacist. The identity of the manufacturer
> will continue to be kept under seal.

*Id.* at *1. Even in the face of this expansive ruling, South Dakota carried out two lethal injection executions in 2018 and 2019.

If these other jurisdictions were able to strike a balance between providing important information about the drugs used when taking a prisoner's life, and protecting states' ability to conduct the executions, there is no reason why South Carolina cannot do the same.

### D.     Plaintiff Bowman has raised strong procedural due process claims.

In sum, Bowman can meet the "likelihood of success on the merits" prong of his injunction request because he has a strong claim that Defendants' conduct violates his procedural due process rights. Plaintiff Bowman has a state-created right to information to be able to select the least inhumane method of execution that is available. Without the necessary information, it is highly likely, if not certain, that Bowman's right to meaningfully elect his method of execution will go unmet. And Defendants do not have a countervailing State interest because the material Bowman seeks is not expressly barred by state law, and other states have been able to conduct executions while also providing the very same information.

## II.     Plaintiff Bowman will suffer irreparable injury without an injunction.

The next factor the Court must consider is irreparable injury. Bowman's execution is scheduled for January 31, 2025. If his execution is not stayed, he faces the irreparable harm of being put to death without the state-granted right to choose, on a meaningful and appropriately-informed basis, the least inhumane method of execution available to him. "In cases involving the death penalty when an execution date has been set, as here, it is a certainty that irreparable harm will result if the [execution] . . . is not stayed." *Beaver v. Netherland*, 101 F.3d 977, 979 (4th Cir. 1996). It is difficult to imagine a more irreparable, serious harm than a death inflicted through a

lingering and painful method that could have been avoided had the State provided the basic information necessary to make an informed choice about Plaintiff Bowman's manner of death; and a choice, no less, that Bowman has a right to under state law. Because Bowman has established a strong showing of irreparable harm, his need to show a likelihood of success on the merits is less stringent. *Rogers v. Comprehensive Rehab. Assocs., Inc.*, 808 F. Supp. 493, 498 (D.S.C. 1992).

The risk of irreparable injury is only heightened by the fact that Richard Moore's pentobarbital execution did not go as planned—possibly involving the terrifying sensation of drowning for several minutes before his death—and the compounding risk that the available pentobarbital will not be sufficient to bring about a speedy and uncomplicated death for Plaintiff Bowman, a person of unusually large size.[4]  Bowman's unusually large body size will require a different dosage than the average person to ensure the execution occurs without the problems seen in Moore's execution. Complaint Exhibit 16.   Because Plaintiff Bowman's body composition falls into the "severely obese" category, there is an increased danger of difficult IV access that could be compounded by an "ineffective dose of pentobarbital" leading to a potentially torturous execution process. *Id*.  At the very least, due process should require that Bowman have access to all of the available information to assess these risks when choosing his method of execution, where the disclosure of that information is not explicitly barred by state law.

---

[4] The Department of Corrections shows Marion Bowman's height as 6'04" and his weight as 389 lbs. (available at *Inmate Search Detail Report, Bowman, Jr., Marion*, https://public.doc.state.sc.us/scdc-public/inmateDetails.do?id=%2000006006) (last visited January 10, 2025).

III.    **The threatened injury to Plaintiff Bowman outweighs any minimal harm injunctive relief might cause to Defendants, and an injunction services the public interest.**

The balance of equities tips in Bowman's favor. As already discussed, the information Bowman seeks is not barred from disclosure by any state law, and has been provided in other states that have been able to vindicate their interests in imposing death sentences. There is no reason why South Carolina should be any different. Moreover, the Court can require disclosure of the drug-related information without having to find any aspect of state law unconstitutional. Bowman's claim is not that the secrecy law itself violates due process rights; it is that Defendants' implementation of the law withholds far more than is necessary to protect the state interests the statute was designed to ensure.

As a result, giving Bowman the critical information he needs to make a meaningful, informed decision about his method of execution will pose no barrier to Defendants carrying out executions, nor will it meaningfully disrupt any other state interest or state law. While Defendants certainly have an interest in the timely enforcement of death sentences, this interest should carry little weight in the the Court's analysis since the relief Plaintiffs seek in this suit will not cause any significant delay.

Finally, the public interest in disclosure and injunctive relief also favors Bowman. As discussed, Defendants' secrecy policies about lethal injection are some of the most restrictive in the country, and in some respects conceal more information than other states that have carried out lethal injections during the time period that South Carolina officials claimed they were unable to. If South Carolina is indeed going to continue executing prisoners, it is undoubtedly in the public interest that Defendants provide sufficient information to permit South Carolinians residing on death row to choose the least inhumane execution method that is available.

"[C]onfidence in the humane application of the governing laws of the State must be in the public's interest." *Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004).

In the prior *Bixby* litigation before this Court, Defendants could only muster speculative reasons why it was implementing the secrecy law as broadly as possible. Anti-death penalty advocates could "hound the supplier" of the execution drug, Defendants suggested. Prisoners from other states could try to subpoena information from SCDC or subject SCDC to discovery requests about the drugs. *Bixby*, No. 3:24-cv-05072-JDA, Docket Entry 10, pp. 15-16. Yet Defendants never explained how the relief sought—information disclosed to the prisoner's counsel pursuant to a carefully crafted protective order—would lead to advocate hounding or improper discovery requests (which, of course, can be easily disposed of by courts). This Court should not dismiss procedural due process concerns, let alone those implicating the manner in which a person will die, on the basis of such thin conjecture.

Apparently, what Defendants really believe is that no substantial information about the execution drugs can be provided because, as they said in *Bixby*, "[n]o matter what steps are taken to protect information in discovery, there remains the inherent danger and hardship that would follow even an inadvertent disclosure." *Id.* at p. 16 (internal citation omitted). This maximalist position reveals how Defendants' application of the secrecy law is out of balance. The South Carolina Legislature could have passed a law that said no information whatsoever about the execution drugs was allowed to be disclosed. It did not. Instead, the Legislature focused on protecting the identities of the companies and individuals involved in the execution process, not the properties of the drugs. When conducting the due process balancing of Plaintiff Bowman's interests against those of Defendants, the Court should consider that Defendants' concealment of information goes well beyond what the plain language of the state secrecy law requires.

Carrying out executions in a humane and constitutional manner is vitally important to the public. The humanity recognized by Eighth Amendment jurisprudence requires the State to make every effort to humanely execute Bowman. *See Hall v. Florida*, 572 U.S. 701, 708 (2014) ("By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons."). Moreover, the public interest calls for executions to be carried out cautiously and deliberately. *See Stanley v. Illinois*, 405 U.S. 645, 656 (1972) (acknowledging that the "Constitution recognizes higher values than speed and efficiency"). The public interest thus favors the Court granting an injunction so that Plaintiff Bowman's execution is not carried out before State officials provide him with basic information about the process that is readily available in other active death penalty jurisdictions.

## CONCLUSION

Plaintiff Bowman has a right under state law to reasonable information needed to make an informed decision about the method by which he will be put to death, and that information can be provided without doing any appreciable harm to Defendants' interest in carrying out his execution without undue delay.

Bowman therefore seeks the following relief. At a minimum, the Court should temporarily stay his execution to permit full briefing and consideration of his motion for a preliminary injunction. Following briefing on the motion, and any argument or hearing the Court may choose to conduct, the Court should also enter a preliminary injunction halting Bowman's execution until such time as the Court is able to fully resolve this suit.

Plaintiff Bowman asks the Court to establish expedited briefing and hearing schedules to address the matters raised in this motion and in the complaint.

Respectfully submitted,

*/s/ Gabrielle Amber Pittman*
Gabrielle Amber Pittman
Deputy Chief
Capital Habeas Unit for the Fourth Circuit
G_Amber_Pittman@fd.org

David Weiss
Assistant Federal Public Defender
Capital Habeas Unit for the Fourth Circuit
David_C_Weiss@fd.org

Federal Public Defender
for the Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
(704) 688-6946

*/s/ Lindsey S. Vann*
Lindsey S. Vann
JUSTICE 360
900 Elmwood Avenue, Suite 200
Columbia, SC 29201
Lindsey@justice360sc.org

COUNSEL FOR PLAINTIFFS

January 13, 2025