## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

MARION BOWMAN, JR.,

                *Plaintiff,*

   v.

BRYAN P. STIRLING, in his official capacity as
the Director of the South Carolina Department
of Corrections; and HENRY DARGAN
MCMASTER, in his official capacity as
Governor of the State of South Carolina,

                *Defendants.*

Civil Action No.: 3:25-cv-199-JDA

**RESPONSE TO
MOTION FOR INJUNCTIVE RELIEF**

Henry Dargan McMaster, in his official capacity as Governor of the State of South Carolina, and Bryan P. Stirling, in his official capacity as the Director of the South Carolina Department of Corrections, respond, on an expedited basis (ECF No. 12), to Marion Bowman, Jr.'s Motion for Injunctive Relief (ECF No. 6). The Court should deny Bowman's request to stay or enjoin his execution, which the S.C. Supreme Court has scheduled for **Friday, January 31, 2025**.[*]

## <u>INTRODUCTION</u>

"Last-minute stays should be the extreme exception, not the norm." *Bucklew v. Precythe*, 587 U.S. 119, 150 (2019). Nothing about this case is exceptional, so the Court should not stay Bowman's execution.

---

[*] Bowman asks for a "temporar[]y stay . . . to permit full[] briefing and consideration of his motion for a preliminary injunction." ECF No. 6, at 20. Such a stay is unnecessary. For one, Bowman has already fully briefed his motion. *Cf.* Local Civ. R. 7.07 (D.S.C.) ("Replies to responses are discouraged."). And for another, this Court can decide emergency motions to stay executions on condensed schedules. *See, e.g.*, *Bixby v. Stirling*, No. 3:24-CV-05072-JDA, 2024 WL 4224081 (D.S.C. Sept. 18, 2024). There is no need for multiple rounds of briefing on injunctive relief motions.

Bowman frames his claim as a procedural one, insisting that he has a right to more information about the pentobarbital that will be used in his execution. But Bowman's argument isn't a procedural due process one. He does not attack the *process* that South Carolina has afforded him to challenge what information he received from the Director. In fact, Bowman has not even invoked that process. That failure alone disposes of Bowman's procedural due process claim. Even if it didn't, the S.C. Supreme Court allows a condemned inmate to challenge the Director's certification in that court and has guaranteed to "promptly decide" such a challenge. *Owens v. Stirling*, 443 S.C. 246, 293, 904 S.E.2d 580, 605 (2024). That process provides the "notice and an opportunity to be heard" that due process requires. *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 149 (4th Cir. 2014)

Rather than challenging the process that South Carolina provided him (and he failed to utilize), Bowman proffers a substantive argument. In short, he claims that South Carolina has given him a right to elect his method of execution, but that the State must provide him even more information about the drugs that will be used for him to exercise that right. That's wrong as a matter of both state and federal law. As for state law, the S.C. Supreme Court has already rejected (in Freddie Owens's case) the argument that the information the Director has disclosed in his certification is insufficient for a condemned inmate to exercise a right to elect. *See* ECF No. 1-8. That state-law decision is binding here. *Musser v. Utah*, 333 U.S. 95, 98 (1948). As for federal law, courts have repeatedly rejected claims that death row inmates have a due process right to the type of information Bowman seeks about about his execution. *E.g.*, *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1267 (11th Cir. 2014).

As with Freddie Owens and Richard Moore, "[t]he people of [South Carolina], the surviving victims of Mr. [Bowman]'s crimes, and others like them deserve better" than more delay.

*Bucklew*, 587 U.S. at 149. The Court should not let Bowman transmogrify the legislative grace of electing a method into a litigation sword to delay further his decades' old sentence. The State has a "significant interest in" finally "enforcing its criminal judgments," *Nelson v. Campbell*, 541 U.S. 637, 650 (2004), and this Court should deny Bowman's motion so that his execution may proceed.

## FACTUAL BACKGROUND

### A.     Bowman is sentenced to death for a gruesome murder.

Marion Bowman claimed that Kandee Martin owed him money. He confronted her one day in February 2001, and after their conversation, told he someone else, "Fuck it, that bitch. That bitch be dead by dark." That night, on a dark country road, Bowman shot Martin twice, once in the chest and once in the head. He dragged her body into the woods. Still in the dark early the next morning, Bowman returned. He put Martin's body in the trunk of Martin's car and lit the car on fire. *State v. Bowman*, 366 S.C. 485, 489–92, 623 S.E.2d 378, 380–82 (2005). A jury convicted Bowman of murder (as well as arson) and sentenced him to death.

The S.C. Supreme Court affirmed. *Id.* at 503, 623 S.E.2d at 387. The state courts rejected his post-conviction-relief claims, and the federal courts then denied any relief on his habeas claims. *Bowman v. Stirling*, 45 F.4th 740 (4th Cir. 2022). The Supreme Court denied cert. *Bowman v. Stirling*, 143 S. Ct. 2498 (2023).

### B.     South Carolina authorizes three methods of execution.

For years, South Carolina could not carry out any executions because SCDC, like many other departments of corrections around the country, could not obtain lethal injection drugs and lethal injection was the State's default method for executions. "[T]o address the unavailability of the necessary drugs, and yet enable the State to carry out the sentence of death for inmates upon whom that sentence was lawfully imposed, [the S.C.] General Assembly again amended" the

State's method-of-execution statute. *Owens*, 443 S.C. at 258, 904 S.E.2d at 586 (discussing 2021 S.C. Acts No. 43). The amended statute made electrocution the default method, while also giving a condemned inmate the opportunity to elect the firing squad or lethal injection, if those methods are available. *See* S.C. Code Ann. § 24-3-530. SCDC's director must certify for each execution which methods are available after the S.C. Supreme Court issues an execution notice. *Id.* § 24-3-530(B).

After the Governor signed Act 43 into law and the S.C. Supreme Court issued an execution notice for Owens, he and others challenged electrocution (at that time, the only available method) in both state and federal court. *See Owens v. Stirling*, No. 2021-CP-40-02306 (S.C. Comm. Pls.); *Sigmon v. Stirling*, No. 3:21-cv-1651 (D.S.C.). Those inmates eventually dropped the federal case, and all the state court litigation was consolidated. *See* Third Am. Compl., *Owens v. Stirling*, No. 2021-CP-40-02306 (S.C. Comm. Pls. Apr. 11, 2022).

The state trial court held for the inmates, deciding that both electrocution and the firing squad were unconstitutional, as was the State's amended method-of-execution statute. After the first oral argument on appeal, the S.C. Supreme Court held most of the case in abeyance and remanded for additional discovery "regarding the State's efforts to procure the drugs for lethal injection and the process it undertook to determine the drugs were not 'available' in South Carolina." *Owens*, 438 S.C. at 361, 882 S.E.2d at 863. The S.C. Supreme Court later stayed the case on remand to give the General Assembly the opportunity to pass the Shield Statute. The General Assembly did so. *See* 2023 S.C. Acts No. 16. The S.C. Supreme Court then stayed the case on remand again to give SCDC a chance to secure drugs for lethal injection. With the benefit of the newly passed Shield Statute, SCDC managed to secure pentobarbital.

When the S.C. Supreme Court took up the case again, it reversed the trial court. It held that

both electrocution and the firing squad are constitutional under state law, as is the amended methods-of-execution statute. *See generally Owens*, 443 S.C. 246, 904 S.E.2d 580.

As part of that decision, the S.C. Supreme Court addressed the inmates' concerns over information and explained that "the Director must explain in the affidavit the basis for his determination" under section 24-3-530(B) about which methods of execution are available. *Id.* at 292, 904 S.E.2d at 604. The court also expressly permitted a condemned inmate to challenge the Director's required certification. If an inmate raised such a challenge, the court promised to "promptly decide" it. *Id.* at 293, 904 S.E.2d at 605.

**C.    Director Stirling certifies that all three methods are available for Bowman's execution, and Bowman sues.**

The S.C. Supreme Court issued an execution notice for Bowman on January 3, setting his execution date for January 31. *See* ECF No. 1-14. Five days later (at the time the S.C. Supreme Court had instructed), Director Stirling certified, under section 24-3-530(B), that all three methods of execution were available, so Bowman was afforded the opportunity to select any of the three statutorily authorized methods. *See* ECF No. 1-15.

As for lethal injection, Director Stirling explained that the pentobarbital was tested by SLED's Forensic Services Lab ("an internationally accredited forensic laboratory . . . that . . . used widely accepted testing protocols and methodologies in this matter" with testing performed by "experienced, qualified, and duly authorized personnel"), which "confirmed the concentration of the solution provided is consistent with the vial labeling of pentobarbital, 50 milligrams per milliliter, and acknowledged the substance's concentration in terms of its purity and stability." ECF No. 1-15, at 4–5. This disclosure tracked the S.C. Supreme Court's upper "extreme example[]" of what information might be included in Director Stirling's certification, and an example that the court "doubt[ed] there could be any legitimate legal basis on which to mount a

challenge." *Owens*, 443 S.C. at 293, 904 S.E.2d at 605.

Bowman did not challenge this certification in the S.C. Supreme Court. Instead, he brought this suit. He claims to bring a procedural due process challenge to the information that the Director has provided. *See* ECF No. 1. He seeks even more information about the drugs that will be used in his execution (such as details about the testing and test results, the beyond use or expiration date, and how they have been stored). *Id.* ¶ 55. This is the same information that Freddie Owens demanded before his execution, but this Court rejected his claim. *See Bixby*, 2024 WL 4224081, at *2 n.4, 7.

**D.    The Shield Statute.**

Given Bowman's focus on the Shield Statute in his motion, it's worth an overview of that law.

The text of the Shield Statute makes at least four things indisputable. First, any entity that "manufactures" or "compounds" the "drugs . . . utilized in the execution of a death sentence" is covered by the statute. S.C. Code Ann. § 24-3-580(A)(1). Second, "any identifying information" about that entity "shall be confidential." *Id.* § 24-3-580(B). Third, "identifying information" is a "broad[]" term that includes "any record or information that reveals a name, date of birth, social security number, personal identifying information, personal or business contact information, or professional qualifications." *Id.* § 24-3-580(A)(2). Fourth, the Shield Statute "shall be broadly construed by the courts of this State so as to give effect to the General Assembly's intent to ensure the absolute confidentiality of the identifying information of any person or entity directly or indirectly involved in the planning or execution of a death sentence within this State." *Id.* § 24-3-580(I).

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy" and "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (internal quotation mark omitted). Plus, there "is the strong presumption against granting a stay of execution." *Baker v. Saar*, 402 F. Supp. 2d 606, 607 (D. Md. 2005). A plaintiff must show four elements to obtain that relief: (1) likelihood of success on the merits, (2) irreparable harm, (3) the balance of the hardship tips in his favor, and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). If a plaintiff fails to satisfy any factor, a court need not consider the remaining factors. *See Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023).

## ARGUMENT

### I.     Bowman is not likely to prevail on the merits.

#### A.     Bowman does not have a viable procedural due process claim.

Bowman says he's asserting an "as-applied" "procedural due process" claim. ECF No. 1, at 15 (claim for relief); ECF No. 6, at 6. That claim quickly falls apart.

Procedural due process isn't about an outcome. It's about a process. *Tri Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 436 (4th Cir. 2002). To be sure, a plaintiff needs some life, liberty, or property interest at issue, but the crux of a procedural due process claim isn't about that interest—it's about what procedure the State provides before depriving someone of that interest. *Mathews v. Eldridge*, 424 U.S. 319, 332–33 (1976). In reviewing the process that the State gives, it is not "a meticulous examination of the minutiae of the state's procedural rubric," but "is simply a guarantee that there is notice and an opportunity to be heard." *Snider Int'l Corp.*, 739 F.3d at 149 (cleaned up); *cf. Baze v. Rees*, 553 U.S. 35, 51 (2008) (plurality) (courts are not "boards of inquiry charged with determining 'best practices' for executions").

7

As for the information that a condemned inmate receives about lethal injection drugs, the S.C. Supreme Court has established a process for an inmate to challenge the Director's certification that lethal injection is available. In *Owens*, the death row inmates insisted that section 24-3-530 entitled them to certain "basic" information about "the drugs' 'potency, purity, and stability.'" 443 S.C. at 292, 904 S.E.2d at 604 (quoting death row inmates' counsel). The S.C. Supreme Court agreed with that argument, noting "a Due Process component to [its] analysis." *Id.* The court required the Director to "explain in the affidavit" that he files under section 24-3-530(B) "the basis for his determination" about which methods are available for each execution. *Id.*

Rather than laying out a precise formula for what the Director must say, the court offered "two extreme examples," one at each end of the spectrum of sufficiency. *Id.* at 293, 904 S.E.2d at 605. On the insufficient "extreme," the Director might "accept[] the word of an unnamed person with unknown qualifications." *Id.* On the sufficient "extreme," the Director might "certif[y] in the affidavit that scientists at the Forensic Services Lab of the South Carolina Law Enforcement Division (SLED), whose experience and qualifications were verified by the Director and the Chief of SLED, recently performed testing according to widely accepted testing protocols and found the drugs were not only stable, but of a clearly acceptable degree of purity." *Id.* But whatever his certification includes, the court emphasized that "the Director must comply with the shield statute." *Id.*

The court even explained the schedule it would follow. It would issue execution notices only on a Friday, thereby maximizing the days between the notice and an execution. *Id.* at 292 n.23, 904 S.E.2d at 604 n.23. The Director must then submit his certification by the next Wednesday, giving the condemned inmate until the following Friday to elect a method 14 days before his execution. *Id.* "This procedure," the court explained, "gives the inmate at least eight

days in which to evaluate the affidavit and file any motion [to challenge the certification]." *Id.* If an inmate chooses to file such a motion, he must do so "no later than fifteen days prior to the date of the scheduled execution" (that is, on the day before the statutory deadline for electing a method). *Id.* (cleaned up) (quoting *In re Stays of Execution in Cap. Cases*, 321 S.C. 544, 548, 471 S.E.2d 140, 142 (1996)). "If a challenge is made," the S.C. Supreme Court continued, that court "will promptly decide if the challenge warrants relief." *Id.* at 293, 904 S.E.2d at 605.

This process gives a condemned inmate what, "[a]t bottom, procedural due process requires": "fair notice" (when he receives the certification, *see* ECF No. 1-15, at 2) and "an opportunity to be heard" (directly in the S.C. Supreme Court). *Snider Int'l Corp.*, 739 F.3d at 146.

That is the process that Freddie Owens used to challenge the Director's certification. *See* ECF No. 1-6. True, the S.C. Supreme Court rejected Owens's objections, *see* ECF No. 1-8, but Owens was afforded a fair and adequate *process* to object to the Director's certification. And tellingly, despite failing to utilize it, Bowman never criticizes that process (which is further confirmation that Bowman isn't truly asserting a procedural due process claim, *see infra* Part I.B.).

To be sure, that process was open to Bowman. But, for whatever reason, he didn't invoke it. Perhaps he didn't do so because he assumed the S.C. Supreme Court would also reject his objections to the Director's certification. That does not mean, however, that the process is constitutionally deficient. "[P]rocedural due process does not require certain results—it requires only fair and adequate procedural protections." *Tri Cnty. Paving, Inc*, 281 F.3d at 436.

More problematically for Bowman, his failure to challenge the Director's certification means his procedural due process claim cannot succeed. Because Bowman "chose not to pursue . . . the[] avenue[] of relief in the state courts," he "cannot complain now that the state did not provide adequate procedures." *Id.* at 438; *see also Kendall v. Balcerzak*, 650 F.3d 515, 530

9

(4th Cir. 2011) ("A procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." (cleaned up)).

Bowman cannot escape this conclusion by trying to cast the "process" more broadly as the imposition of his sentence. The State has provided Bowman ample process on that front: a criminal trial, a direct appeal, and the State's postconviction relief process, not to mention the federal habeas process (all with their attendant constitutional and procedural protections). Nor can Bowman frame his interest as a right to election generally. Bowman has—and has already exercised—a right to elect his method of execution. *See* Notice of Election, No. 2025-000013 (S.C. Jan. 17, 2025) (electing lethal injection).

At most, Bowman's interest here is a right to information (a point Bowman, at times, appears to concede, *e.g.*, ECF No. 1, ¶ 49). He claims he's being denied that interest by not being given the information he has demanded. *See id.* ¶ 34. As the S.C. Supreme Court said, Bowman is entitled to "some basic facts" about the drugs. *Owens*, 443 S.C. at 292, 904 S.E.2d at 604. But what those "basic facts" are is a substantive question of state law. A *procedural* due process claim must be about the process that the State affords Bowman to challenge whether the information he received is enough to constitute those "basic facts." In other words, the procedural due process analysis focuses on the sufficiency of the procedure that the State afforded Bowman to challenge the adequacy of the information provided. Try as he might, Bowman cannot indirectly appeal to this Court, under the auspices of a procedural due process claim, whether the State correctly answered the question (which Bowman didn't even ask) of whether that information was sufficient.

\*     \*     \*

10

But even if the Court were to evaluate Bowman's claim under the traditional three-factor test for procedural due process, *see Mathews*, 424 U.S. at 335, his claim still fails as a matter of law.

As for his interest, Bowman overstates it. He has, at most, a state-created interest in electing a method of execution. *See* S.C. Code Ann. § 24-3-530(A). This statutory opportunity is purely a matter of legislative grace and a product of "the General Assembly's sincere effort to make the death penalty less inhumane" by permitting "the condemned inmate . . . to have the State employ the method he and his lawyers believe will cause him the least pain," all "while enabling the State to carry out its laws." *Owens*, 443 S.C. at 298, 904 S.E.2d at 608. That is *not* the same thing as a right to know everything he wants about each method of carrying out his conviction. *See infra* Part I.B.1.

As for the risk of erroneous deprivation, Bowman offers only speculation about the pentobarbital that will be used—the same drug that was used without issue, according to the eyewitnesses, in the State's two most recent executions. *See infra* Part I.C.

And as for the government's interest, South Carolina has a "significant interest in enforcing its criminal judgments," *Nelson*, 541 U.S. at 650, and its laws generally, *cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (a State suffers "irreparable injury" "[a]ny time" its law is enjoined). To obtain the drugs to carry out executions by lethal injection, South Carolina must make great efforts to protect its sources and the identities of those involved in the process. If it doesn't, lethal injection may not be available for election in future executions. It is, by now, a "well-known phenomenon" that "drug suppliers, once exposed to pressure from activists opposed to the death penalty, refuse to supply drugs to state corrections departments." *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 184 (4th Cir. 2019); *see also Jordan v. Comm'r, Miss. Dep't of*

*Corr.*, 947 F.3d 1322, 1341 (11th Cir. 2020) ("[D]isclosure of the supplier for a particular drug used by a state in executions will have predictable consequences: anti-death penalty advocates will hound the supplier of that drug until the supplier capitulates and ceases supplying the drug."); *cf.* Part II (discussing the public interest).

**B.**     **Bowman could not prevail even if he was bringing a substantive due process claim.**

Bowman may try to frame his claim as a process one (*i.e.*, "I need this information as a step in evaluating the methods of execution and making an election"), but his argument sounds in substance. *E.g.*, ECF No. 1, ¶ 47 ("Plaintiff has requested certain information about the potency, purity, and stability of the drugs that may be used for his execution. Defendant Stirling refused to provide that information."). Put simply, he insists he has a right to certain information, not to any procedures. That much is clear because, assuming he had objected to the Director's certification in the S.C. Supreme Court and lost, Bowman would not have acknowledged, "At least the State gave me a forum to be heard," and elected a method without further litigation. Rather, he would have exclaimed, "The S.C. Supreme Court is wrong," and brought a lawsuit in this Court demanding the information that the S.C. Supreme Court didn't give him (putting aside the *Rooker-Feldman* issue). Such a claim (if Bowman had pleaded that, *see* Fed. R. Civ. P. 8(a)(2) (requiring a plaintiff to plead "a short and plain statement *of the claim*")) would fail, whether based on state or federal law.

**1.**     **Bowman has no viable claim based on state law.**

State law sets electrocution as the default method of execution, but it gives a condemned inmate the option to elect "firing squad or lethal injection, if it is available at the time of election." S.C. Code Ann. § 24-3-530(A).

If Bowman's claim would be about information, the S.C. Supreme Court has recognized a

right to "some basic facts" and to know how the Director determined lethal injection was available based on "the drugs' 'potency, purity, and stability.'" *Owens*, 443 S.C. at 292, 904 S.E.2d at 604. The Director has provided that information to Bowman, *see* ECF No. 1-15, and given the S.C. Supreme Court's decision on Owens's objection, *see* ECF No. 1-8, that information satisfies whatever state law requires. *See Bixby*, 2024 WL 4224081, at *6 ("the [S.C. Supreme C]ourt specifically decided—in overruling Owens's objections—that Stirling has provided Owens all of the information that the Statute requires"). And not just what section 24-3-530 requires. The S.C. Supreme Court has already acknowledged "a Due Process Clause component" to its analysis of the Director's certification. *Owens*, 443 S.C. at 292, 904 S.E.2d at 604.

As a matter of state law, Bowman can get no traction on the argument that he is entitled to more information than the Director has already provided. The S.C. Supreme Court made that much clear in rejecting Owens's objection to the Director's certification. *See* ECF No. 1-8. After all, if the S.C. Supreme Court had interpreted section 24-3-530 to require the information that Bowman demands, there is no way that court could have rejected Owens's objection. So whether the Shield Statute protects the information that Bowman seeks doesn't alter the analysis because, even if it doesn't, the S.C. Supreme Court has held that any right to elect a method of execution does not carry with it the right to the information Bowman seeks. *Cf. Fusaro v. Cogan*, 930 F.3d 241, 249–50 (4th Cir. 2019) ("there is no general First Amendment right to access a government record," and "the decision to make government information available to the public is generally a question of policy for the political branches"). The S.C. Supreme Court, of course, gets "the final word" on the meaning of state law. *Musser*, 333 U.S. at 98.

If Bowman's claim were about a right to elect more generally, no one is denying him that right. All three options were available to him, *see* ECF No. 1-15, and Bowman has, in fact, elected

13

his method of execution, *see* Notice of Election, No. 2025-000013 (S.C. Jan. 17, 2025). Bowman alleges that he has a right not to "be subjected to execution by a method he contends is more inhumane than another method that is available," ECF No. 1, ¶ 48 (quoting *Owens*, 443 S.C. at 299, 904 S.E.2d at 608), but this Court has already rejected the idea that this means an inmate can learn whatever he wants about each method. South Carolina law, this Court explained, gives a condemned inmate "the right to choose his method of execution—period," but "not the right to discover what is, objectively, the best choice, nor the right to discover whether the execution methods are constitutional." *Bixby*, 2024 WL 4224081, at *7 (footnote omitted). Having an option between multiple methods means that an inmate will never have to choose a method he believes is more painful—precisely the choice Bowman had and has already made. That's what the S.C. Supreme Court meant. Nothing more.

### 2.    Bowman has no viable claim based on federal law.

What Bowman seems to be trying to do—but unwilling to admit—is to federalize the "basic facts" to which he is entitled. *Owens*, 443 S.C. at 292, 904 S.E.2d at 604. That is, he wants to impose a federal due process requirement on what information he must receive to make what he calls an "informed choice." ECF No. 6, at 7. But again, that's a substantive argument, not a procedural one.

Bowman would hardly be the first condemned inmate to insist that the Due Process Clause guarantees him the right to various information about the drugs that will be used in his execution. Courts, however, have consistently rejected such claims. As the Eleventh Circuit put it, due process does not encompass "the broad right to know where, how, and by whom the lethal injection drugs will be manufactured, as well as the qualifications of the person or persons who will manufacture the drugs, and who will place the catheters." *Wellons*, 754 F.3d at 1267 (denying stay of execution);

*see also, e.g.*, *Phillips v. DeWine*, 841 F.3d 405, 420 (6th Cir. 2016); *Zink v. Lombardi*, 783 F.3d 1089, 1109 (8th Cir. 2015); *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014); *cf. Giarratano v. Johnson*, 521 F.3d 298, 304–05 (4th Cir. 2008) (no right for an inmate to obtain copies of prison medical protocols to "make informed decisions about his health").

A Texas case from a decade ago serves as a compelling example. Like Bowman, the inmate there demanded information about the pentobarbital for his execution: the source of the drugs, how the drugs were stored, and the results of testing, just to name a few. *See Sells v. Livingston*, 561 F. App'x 342, 344 (5th Cir. 2014). The Fifth Circuit vacated the stay of his execution, noting that Texas had said it would follow its protocol (Bowman's lawyers have a copy of SCDC's protocol), told the dosage that would be used (Bowman knows that too), and informed that an independent lab had tested the drugs and found them sufficiently potent (again, Bowman knows SCDC had the drugs tested). *Id.* If a drug was "never before used or unheard of" and the "efficacy or science was completely unknown," the Fifth Circuit explained, "the case might be different." *Id.* But merely a new source of drugs was not enough to justify staying an execution to answer an inmate's litany of questions. *Id.*

There's a reason that courts have repeatedly rejected these claims. Substantive due process protects only "fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (cleaned up). There is nothing in America's history or tradition that requires giving condemned inmates the level of detail that Bowman demands here. *See generally* Stuart Banner, *The Death Penalty: An American History* (2003).

    **C.**    **The Court should not give any credence to Bowman's speculative attack on lethal injection.**

Bowman tries to point to the State's recent executions of Freddie Owens and Richard

15

Moore to claim that the pentobarbital to be used is somehow defective. It's no surprise that he would try to make this argument. A careful reading of the report from David Waisel, however, reveals its flaws.

Start with the obvious. "[S]peculation" about a drug "cannot substitute for evidence" about it. *Brewer v. Landrigan*, 562 U.S. 996, 996 (2010); *see also Creech v. Tewalt*, 94 F.4th 859, 862–63 (9th Cir. 2024) (refusing to stay an execution based on "arguments about the provenance, quality, and reliability of the drug" that were "purely speculative"). Waisel opines about what would happen "if" an inmate was sensate. ECF No. 1-16, ¶ 9. That's the same type of expert speculation that the S.C. Supreme Court rightly rejected about electrocution in *Owens*. *See* 443 S.C. at 275–77, 904 S.E.2d at 595–96. And it's the type of evidence that doesn't carry a plaintiff's "heavy burden" to obtain a preliminary injunction. *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017).

Waisel presumably would disclaim any speculation based on the time that passed between the execution beginning and the announced time of death. *See* ECF No. 1-16, ¶ 7. But Waisel conflates different concepts on this front. Electrical activity may be observed on a heart monitor for some time after breathing stops. *See, e.g.*, S.C. Code Ann. § 44-43-460 ("An individual who has sustained irreversible cessation of circulatory *and* respiratory functions or irreversible cessation of all functions of the entire brain, including the brain stem, is dead." (emphasis added)); *cf. Owens*, 443 S.C. at 277, 904 S.E.2d at 596 (discussing evidence of how the brain and heart don't necessarily cease functioning at the same time). In other words, a condemned inmate may (and typically does) stop breathing before all electrical activity from his heart ceases. As Dr. Antognini explains, a person's body must use up any stored oxygen after breathing stops, which results in "periodic irregular beats" before "the heart stops all together." Decl. of J. Antognini ¶ 7;

*see also id.* ¶ 26. Both the circulatory and respiratory systems must completely stop before the inmate is declared dead in a lethal injection execution. S.C. Code Ann. § 44-43-460. And some lag time between when breathing stops and when death is pronounced is typical. Indeed, this lag is consistent with the fact that "it would not be unexcepted that some heart electrical activity persists after 10 minutes," meaning that the second injection would happen under the protocol. Decl. of J. Antognini ¶ 28.

The problems with Waisel's contentions don't stop there. He relies on the press conference from the media witnesses following Owens's execution, *see* ECF No. 1-16, ¶ 10, but he ignores most of what those witnesses reported. According to the witnesses, Owens "appeared to lose consciousness after about a minute," after which "his eyes closed and he took several deep breaths." Jeffrey Collins, *South Carolina Inmate Dies by Lethal Injection in State's First Execution in 13 Years*, Associate Press (Sept. 20, 2024), https://tinyurl.com/3x7662j8. Then, "[h]is breathing got shallower and his face twitched for another four or five minutes before the movements stopped." *Id.* This is remarkably consistent with the witnesses' description of Richard Moore's execution, which began at 6:01 p.m.: "Moore took several deep breaths that sounded like snores over the next minute. Then he took some shallow breaths until about 6:04, when his breathing stopped. Moore showed no obvious signs of discomfort." Jeffrey Collins, *South Carolina Executes Richard Moore Despite Broadly Supported Plea to Cut Sentence to Life*, Associated Press (Nov. 1, 2024), https://tinyurl.com/2s4tc4vr. These statements contradict Waisel's prediction of conscious pain, and they leave Waisel only speculating about what would happen "if" an inmate was "sensate." ECF No. 1-16, ¶ 9.

As it relates to witnesses, two other things are true of both those executions. First, both Owens and Moore had a lawyer sitting in the front row of the witness room. Second, neither lawyer

ever claimed that either man showed any signs of pain during his execution.

These witness statements (or lack of statements, in the case of the lawyers) align with Dr. Antognini's declaration. He explains how quickly pentobarbital renders a person insensate, at which point that person would not feel anything. *See* Decl. of J. Antognini ¶¶ 8–13.

Another problem is Waisel's pulmonary edema contention. In the first place, pulmonary edema is nothing new in lethal injection. This objection has been lodged against lethal injection generally in recent years, even before South Carolina resumed executions last year. *See, e.g.*, Noah Cadwell, et al., *Gasping for Air*, NPR (Sept. 21, 2020), https://tinyurl.com/4f8aj9ha. Pulmonary edema is thus a criticism of lethal injection generally, not of South Carolina specifically. Plus, it can be found in any death, based on post-mortem CT scans and other studies. *See* Decl. of J. Antognini ¶¶ 18–23. (Of course, Bowman hasn't challenged lethal injection directly, and given the weight of caselaw, he's unlikely to prevail on such a claim. But if he somehow did, South Carolina still authorizes two other constitutional methods of execution. *See* S.C. Code Ann. § 24-3-530(A).)

In the second, the U.S. Supreme Court has already rejected Waisel's argument. A district court stayed federal executions because, according to those inmates' expert, they would "suffer[] flash pulmonary edema" during their executions. *Matter of Fed. Bureau of Prisons' Execution Protocol Cases*, 471 F. Supp. 3d 209, 218 (D.D.C. 2020). The Supreme Court lifted that stay, noting the government offered conflicting evidence—from Dr. Antognini, no less, *see id.* at 219— that "any pulmonary edema occurs only *after* the prisoner has died or been rendered fully insensate," so this was not "the extreme exception" to warrant a "[l]ast-minute stay[]," *Barr v. Lee*, 591 U.S. 979, 981 (2020). Nothing Waisel offers proves that the edema occurs before the inmate is rendered insensate.

And in the third, Waisel doesn't suggest that the effects of any pulmonary edema would

last more than a few moments. As the Eleventh Circuit pointed out in rejecting Waisel's objections to pentobarbital in another case, Waisel "admitted that any suffering was short lived as it clearly ended within a few minutes—three minutes at the most—after the pentobarbital was injected." *DeYoung v. Owens*, 646 F.3d 1319, 1326 (11th Cir. 2011); *see also See* Decl. of J. Antognini ¶ 16 (a person would be quickly rendered insensate and not feel anything after that moment). As Dr. Antognini observes, if Moore was feeling pain for 23 minutes before his death was pronounced, he would have displayed some signs of suffering. *See* Decl. of J. Antognini ¶ 27. But the Constitution prohibits only "serious harm" and "substantial risk," *DeYoung*, 646 F.3d at 1327, because pain is "an inescapable consequence of death," *Baze*, 553 U.S. at 50.

One more point about Waisel's affidavit: He notes Bowman's size (6'4", 375 pounds) in speculating that "Bowman's execution process could become especially complicated, and even tortuous." ECF No. 1-16, ¶ 11; *see also* ECF No. 6, at 10. But Waisel offers no more details to justify such concerns. And if such concerns were serious, why hasn't Bowman asked SCDC about using a larger dose of pentobarbital for his execution rather than bringing this lawsuit? And (as Dr. Antognini again observes), "thousands of obese patients have surgery every day after the successful placement of an intravenous catheter." Decl. of J. Antognini ¶ 29.

Finally, for all his attacks on lethal injection, Bowman overlooks an important fact: South Carolina can also carry out executions by electrocution and the firing squad, both of which Director Stirling certified were available for Bowman's execution. *See* S.C. Code Ann. § 24-3-530(A). The S.C. Supreme Court just upheld both methods as constitutional. *See Owens*, 443 S.C. at 256, 904 S.E.2d at 585. And the U.S. Supreme Court has long stood by each method. *See In re Kemmler*, 136 U.S. 436 (1890) (electrocution); *Wilkerson v. Utah*, 99 U.S. 130 (1878) (firing squad). If Bowman's concerns about lethal injection were genuine, he could have elected another method.

19

## II.     The remaining factors cut against an injunction.

As for irreparable harm, the Fourth Circuit has said, without any analysis, that a condemned inmate will face an irreparable harm without an injunction. *See Beaver v. Netherland*, 101 F.3d 977, 979 (4th Cir. 1996). But not all courts agree—especially ones that have analyzed the issue. As one court reasoned, "[i]rreparable harm, in the context of the death penalty, cannot mean the fact of death" because that "would make analysis of this factor meaningless." *Jackson v. Danberg*, No. CIV. 06-300-SLR, 2011 WL 3205453, at *3 (D. Del. July 27, 2011), *aff'd,* 656 F.3d 157 (3d Cir. 2011); *see also, e.g.*, *Powell v. Thomas*, 784 F. Supp. 2d 1270, 1283 (M.D. Ala. 2011). Instead, a court must consider whether the inmate would suffer some constitutional wrong when his death sentence was carried out. *Jackson*, 2011 WL 3205453, at *3. That logic makes sense, but the Court need not decide whether the Fourth Circuit's single sentence is binding precedent because Bowman has not met the other factors. *Cf. Reid v. Johnson*, 333 F. Supp. 2d 543, 550 (E.D. Va. 2004) (analyzing irreparable harm beyond simply "death is sufficient" to satisfy this element).

Taking the last two factors together, *Nken v. Holder*, 556 U.S. 418, 435 (2009), Bowman tries to downplay the public interest, admitting in passing that the State "certainly ha[s] an interest in the timely enforcement of death sentences," ECF No. 6, at 18. Any delay, he insists, will not be "significant." *Id.* That contention rings hollow, given that Bowman committed his murder in 2001, has been on death row since 2002, and was just granted a judicial reprieve by the S.C. Supreme Court, which stayed its own execution schedule over the holidays. *See* Order, *Sigmon v. State*, No. 2024-001373 (S.C. Nov. 14, 2024). Plus, Bowman is hardly a natural spokesman for the interests of the State or its law-abiding citizens, much less for the interests of his victim or her family.

But more to the point, Bowman discounts the State's compelling interests here. "Both the State and the victims of crime have an important interest in the timely enforcement of a sentence."

*Bucklew*, 587 U.S. at 149. Too often, those interests are "frustrated" by "delay through lawsuit after lawsuit." *Id.* Bowman is no exception: In just the past few months, he's filed cases in state and federal court raising various challenges to his execution. *See Bowman v. Stirling*, No. 2024-002113 (S.C.); *Bixby v. Stirling*, No. 3:24-CV-05072-JDA (D.S.C.). Presumably, he'll always have one more challenge, especially if the courts continue to grant him stays. "The people of [South Carolina], the surviving victims of Mr. [Bowman]'s crimes, and others like them deserve better." *Bucklew*, 587 U.S. at 149. There is indeed even a "moral dimension" to the State's interest in finality. *Calderon v. Thompson*, 523 U.S. 538, 556 (1998); *see also* S.C. Const. art. I, § 24 (victim's bill of rights).

Bowman also ignores the State's separate interest in ensuring that federal courts do not interfere with its criminal judgments. To be sure, federal courts "say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). But in doing so, they "must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). "The proper role of courts is to ensure that method-of-execution challenges to lawfully issued sentences are resolved fairly and expeditiously. Courts should police carefully against attempts to use such challenges as tools to interpose unjustified delay." *Bucklew*, 587 U.S. at 150. From this role flows the common-sense conclusion that "[l]ast-minute stays should be the extreme exception, not the norm." *Id.* That is why courts must guard against the "Groundhog Day" that is capital litigation so that duly imposed, fully appealed judgments can be carried out. *Glossip v. Gross*, 576 U.S. 863, 893 (2015) (Scalia, J., concurring).

Bowman also attacks the South Carolina General Assembly's policy judgment in enacting the Shield Statute, calling the law "some of the most restrictive" "secrecy policies" in the country.

ECF No. 6, at 18. Under the South Carolina Constitution, "the General Assembly has plenary power over all legislative matters unless limited by some constitutional provision." *Hampton v. Haley*, 403 S.C. 395, 403, 743 S.E.2d 258, 262 (2013). Bowman may not like the Shield Statute, but how much to protect information related to executions is not his decision to make.

Going further in his attacks on the Shield Statute, he accuses the Governor and Director of offering only "speculative reasons" for interpreting the Shield Statute "as broadly as possible." ECF No. 6, at 19. For starters, that's what the law says. S.C. Code Ann. § 24-3-580(I). But if that statutory directive were not enough, the Governor and Director have more. Years of experience have shown that death penalty opponents are constantly working to uncover (and even to advertise) the identity of drug suppliers and participants in execution processes. Bowman points out that Texas has disclosed similar information about its lethal injection drugs since 2020, *see* ECF No. 6, at 14, but he conveniently omits the rest of the story: Texas's supplier was identified. *See, e.g.*, Chiara Eisner, *Unmarked Cars and Secret Orders: How a Pharmacy Prepared Drugs for Texas' Executions*, NPR (July 10, 2024), https://tinyurl.com/3ypzp2ek. Perhaps that particular supplier won't care about the disclosure or perhaps Texas has an alternate source, but that has not been the typical experience, *see Va. Dep't of Corr.*, 921 F.3d at 184, and South Carolina should not be forced to cast caution, state-mandated confidentiality, and potential consequences to the wind and simply see what might happen if any of its suppliers or participants in the execution process are publicly identified, *see Oregon v. Ice*, 555 U.S. 160, 171 (2009) (the Court has "long recognized the role of the States as laboratories for devising solutions to difficult legal problems" (citing *New State Ice Co. v. Liebmann,* 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting))). And while some courts may have ordered the types of disclosures that Bowman demands, those cases were different. For instance, *Martin v. Ward*, No. 1:18-CV-4617-MLB, 2021 WL 1186749 (N.D. Ga.

Mar. 30, 2021), involved an Eighth Amendment claim that Georgia would cause the condemned inmate unnecessary suffering. Bowman, by contrast, seeks information for a different reason and only by overreading his state-law right to elect his execution method.

Seemingly recognizing that courts are now protecting States' sources of lethal injection drugs, Bowman offers what he strains to cast as a reasonable way to limit the disclosure. But his plea for disclosure under a "carefully crafted protective order" is wanting for at least three reasons. One, the General Assembly said that law should "be broadly construed." S.C. Code Ann. § 24-3-580(I). Two, when the General Assembly amended the Shield Statute, it expressly removed a provision to allow disclosure "upon a court order under seal for the proper adjudication of pending litigation." 2010 S.C. Acts No. 203, § 1 (prior version of section 24-3-580). In its place, the General Assembly took the opposite approach, prohibiting that information from being "subject to discovery, subpoena, or any other means of legal compulsion or process for disclosure to any person or entity in any administrative, civil, or criminal proceeding in the courts, administrative agencies, boards, commissions, legislative bodies, or quasilegislative bodies of this State." S.C. Code Ann. § 24-3-580(B). That's compelling evidence of the legislature's intent to keep drug information out of litigation. *See Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) ("The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature."). And three, no matter what steps are taken to protect information in discovery, there remains "the inherent danger and hardship that would follow even an inadvertent disclosure." *Jordan v. Hall*, No. 3:15-CV-295, 2018 WL 1546632, at *11 (S.D. Miss. Mar. 29, 2018).

## CONCLUSION

The Court should deny the Motion for Injunctive Relief.

Should the Court grant Bowman any injunctive or other relief, the Governor and the

Director request that the Court stay any such injunction or other order pending appeal under Federal Rule of Civil Procedure 62 and Federal Rule of Appellate Procedure 8(a)(1).

Respectfully Submitted,

s/Wm. Grayson Lambert
Thomas A. Limehouse, Jr. (Fed. Bar No. 12148)
*Chief Legal Counsel*
Wm. Grayson Lambert (Fed. Bar No. 11761)
*Chief Deputy Legal Counsel &*
*Senior Litigation Counsel*
Erica W. Shedd (Fed. Bar No. 13206)
*Deputy Legal Counsel*
Tyra S. McBride (Fed. Bar No. 13324)
*Deputy Legal Counsel*
OFFICE OF THE GOVERNOR
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
tlimehouse@governor.sc.gov
glambert@governor.sc.gov
eshedd@governor.sc.gov
tmcbride@governor.sc.gov

*Counsel for Governor McMaster*

*and*

s/Daniel C. Plyler
Daniel C. Plyler (Fed. Bar No. 9762)
Austin T. Reed (Fed. Bar No. 13405)
Frederick N. Hanna, Jr. (Fed Bar No. 13826)
SMITH │ ROBINSON
2530 Devine Street
Columbia, SC 29205
(803) 254-5445
Daniel.Plyler@SmithRobinsonLaw.com
Austin.Reed@SmithRobinsonLaw.com
Fred.Hanna@SmithRobinsonLaw.com

*Counsel for Director Stirling*

January 22, 2025